UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 05-79-B-W |
| | ) | |
| CAREY GONYER, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON
MOTION TO SUPPRESS**

Carey Gonyer, charged in a one count indictment with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B)(1), has moved to suppress both physical evidence seized from his home and statements he made to investigating officers.  I held an evidentiary hearing on January 19, 2006, and I now recommend the court adopt the following proposed findings of fact and deny the motion to suppress.

**Proposed Findings of Fact**

On March 1, 2004, F.B.I. agent James Herbert, accompanied by Maine State Police detective Brian Strout, traveled to Valley View Farm in Charleston, Maine, for the purpose of engaging in a "knock and talk" with Carey Gonyer.  Agent Herbert explained that a "knock and talk" is an F.B.I. term for an investigator's decision to go to a suspect's home and discuss potential criminal conduct with that person.  Gonyer had become a suspect in a criminal investigation involving child pornography as the result of initial work undertaken by a New Hampshire police detective.  The New Hampshire detective had been corresponding on-line with a person named Carey Gonyer who had provided the detective with a mailing address in Charleston, Maine, in addition to providing his e-mail address and pictures that were described

as depicting child pornography.  The detective had also furnished Herbert a picture of an individual who was identified as Carey Gonyer.

Gonyer was employed at Valley View Farm, a dairy farm, and was working in the vicinity of the barnyard when the officers first arrived and identified themselves, revealing that they would like to talk with him but not the reason for the visit.  Because his employer's residence was near the barn and because there were visitors at the farm, Gonyer suggested that they go to his trailer located a few hundred yards up the road.  The officers drove to the residence as directed by Gonyer.  They were in an unmarked police cruiser and were dressed in plainclothes.  Although Gonyer was taken by surprise when the officers entered the barnyard, there was nothing inherently intimidating or custodial about this initial contact.

When the officers entered the kitchen area of Gonyer's trailer they immediately saw a computer approximately five feet from where they were standing.  Herbert engaged Gonyer in conversation, asking him if he had a computer and an Internet account.  When Gonyer confirmed that he did use the Internet and held an aol account, Herbert asked him what screen names he used.  The names given by Gonyer corresponded with the information provided by the New Hampshire detective.  Gonyer told Herbert that his old computer had recently "died" and that the new one, visible on the nearby table, had only been in his possession for three weeks.  Herbert asked him if he had been using the computer to send pornography over the Internet and Gonyer denied such use.  Gonyer did indicate that a twelve year old named Jeremy also had access to the computer and he did not know what use Jeremy might have made of the computer.

After this preliminary discussion Herbert asked a question regarding the examination of the computer.  The exact wording of this question is disputed, but Gonyer is positively sure that Herbert stated, "We need to take a look at your computer."  Herbert and Strout are less sure

2

about exactly what Herbert said, except they agree it was something like, "Do you mind if we take a look at your computer?"  Herbert does not believe he used the word "need" prior to actually viewing the photographs on the computer.  After he saw the pictures, he may have said, "We will need to take your machine with us."

In any event, all three agree that Gonyer's response to this query was "Yup."  No one is suggesting that Gonyer said the officers could not look at the computer or questioned their actions in any way.  Herbert proceeded to click the mouse on the computer[1] and open the aol icon, whereupon he discovered a folder entitled "butts."  Herbert clicked open that folder and discovered pictures depicting child pornography.  Gonyer denied knowing how the photographs came to be on his computer.  Herbert informed him that he would have to seize the computer's hard drive as evidence.  At this point Herbert got out documentation to give Gonyer a receipt for the items he was seizing and also to obtain Gonyer's signature on a consent to search form.  According to Herbert, he  brought out the form at this time, after the initial search had taken place, because he wanted to have documentation to support the oral consent he had previously received and to satisfy the requirements of the Computer Analysis Response Team, which would conduct an analysis of Gonyer's hard drive.

During the preparation of this paperwork Gonyer continued to deny any knowledge of the pictures, but remained cooperative with the officers.  Herbert asked him if he would be willing to take a polygraph test concerning these issues.  Gonyer refused and Herbert asked him why he would not take the polygraph.  At that point Gonyer admitted he had downloaded pornography from the Internet.

---

[1]      According to Gonyer, Herbert asked him if his computer had a password and when Gonyer told him it did not, Herbert stated, "Good.  I won't have to get out my special tool."  I do not know what to make of this exchange. Herbert was never asked about it and therefore did not deny saying it, but I do not find the testimony especially credible.  In fact, the statement makes no sense to me.  I do not take it as a basis for some "threat" being leveled against Gonyer nor as support for the argument that Gonyer did not consent to the search.

Throughout this one-half-hour interview the officers remained cordial.  Gonyer was never handcuffed, voices were never raised, and arrest was never threatened.  Gonyer did appear nervous throughout this exchange.  However, when the officers returned to his home approximately two months later, Gonyer was again cooperative with them, inviting them back into the trailer and speaking freely with them.

**Discussion**

**1.    <u>Miranda</u> Issue**

Gonyer originally moved to suppress the evidence seized from the computer and his statements made after the discovery of the photographs as fruit of a Fourth Amendment violation.  Prior to the commencement of the evidentiary hearing Gonyer orally moved to amend his motion to include a claim that <u>all</u> statements made by him during either visit by the officers should be suppressed as they were obtained in violation of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and <u>Dickerson v. United States</u>, 530 U.S. 428 (2000), in that they were the product of an unwarned, custodial interrogation.   Although the defendant was not provided with a Miranda warning at any time during either visit by the officers, the Government responds that there was neither a custodial interrogation or the functional equivalent to a custodial interrogation during either visit to the Gonyer premises so that Gonyer's Miranda rights were not implicated.  <u>See</u> <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990); <u>Rhode Island v. Innis</u>, 446 U.S. 291, 299-301 (1980).  The sole issue presented by this aspect of the motion relates to Gonyer's custodial status.

For purposes of the Fifth Amendment, "in custody" means that the defendant has been formally arrested or has had his freedom of movement restrained to the degree associated with a formal arrest.  <u>United States v. Ventura</u>, 85 F.3d 708, 710 (1st Cir. 1996).  Whether the restraint

4

on movement is sufficient to rise to the level of an arrest depends on the objective circumstances and how they would be perceived by a reasonable person standing in the shoes of the suspect. Id. at 711.  "Relevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."  Id. (quotation marks and citation omitted).  Gonyer was not "in custody" on either occasion when he made the statements to the officers and there is no basis under Miranda for suppressing these statements.   Magistrate Judge Cohen previously observed in a recommended decision that the test to be applied to a "knock and talk" situation is an objective one, i.e., whether a reasonable person in Gonyer's position  "would have felt free to decline the agents' requests or otherwise terminate the encounter."  United States v. Cannizzaro, Crim. No. 04-103-P-H, 2005 U.S. Dist. LEXIS 2976, *25, 2005 WL 757884, *8 (D. Me. Feb. 16, 2005) (aff'd Mar. 8, 2005).  In view of the low key encounter described by Gonyer, Herbert, and Strout, I am satisfied that a reasonable person in Gonyer's position would have understood that he had the ability to terminate the encounter.

**2.      The Consent to Search**

The Government seeks to justify this warrantless search of the computer as a search undertaken pursuant to Gonyer's consent.  Gonyer, on the other hand, argues that he merely acquiesced to the officer's show of authority and did not affirmatively consent to the initial search of his computer.  Therefore, he argues, Herbert's initial search of the computer was unlawful and not only that search, but also both the signed consent to the search of the computer and the post-search incriminating statements should be suppressed as fruit of the poisonous tree under Wong Sun v. United States, 371 U.S. 471, 485- 86 (1963).  Under the test set forth in

5

Schneckloth v. Bustamonte, 412 U.S. 218 (1973), consent is voluntary if the defendant's will was not overborne in the sense of suffering a critically impaired capacity for self-determination. Schneckloth, 412 U.S. at 225; United States v. Wilkinson, 926 F.2d 22 (1st Cir. 1991) (overruled on other grounds as recognized by United States v. Manning, 79 F.3d 212 (1st Cir. 1996)).  In this case it is undisputed that defendant responded in the affirmative when the officers indicated their desire/"need" to look at the information on Gonyer's computer.  The issue presented is whether that affirmative response was a "consent" to search.

        With regard to whether show of authority by police officers can be held to vitiate consent to search, the cases I could locate all turn on whether the officers' coercive conduct was such that a reasonable person would have believed that he had no choice but to comply.  See United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005) (collecting "knock and talk" cases and noting that federal courts have recognized the strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to a search).  In the present case, even if Herbert's query was to the effect that the officers needed to search the computer, nothing was done during this encounter that would have conveyed to a reasonable person the notion that he or she had to consent to the agent's stated request/need.  The defendant now maintains that he did not realize that he had the legal right to refuse to consent to the officers' entreaty.  But, of course, the government is not required to show that the person consenting to a search knew of the right to refuse consent in order to establish that the consent was voluntary.  United States v. Matlock, 415 U.S. 164, 166 n.2 (1974); see also United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) ("Written consent is not essential to the establishment of a valid consensual search.").  The government only bears the burden of proving the consent was voluntary.  Florida v. Royer, 460 U.S. 491, 497 (1983).

In this case, as I have indicated, the encounter was extremely low key, taking place in Gonyer's own residence, which the officers entered at Gonyer's invitation. Gonyer was extremely cooperative throughout the interview and up until his admission took the position that he knew nothing about pornography on the computer and had nothing to hide. Gonyer voluntarily divulged facts pertaining to his Internet account information, in addition to permitting Agent Herbert to activate the account, without even the slightest amount of prodding being applied by the officers. And despite these earlier concessions, Gonyer declined the request that he take a polygraph test, demonstrating his understanding that he was not required to comply with Agent Herbert's requests. The officers did absolutely nothing coercive during the encounter. I conclude from these facts that Gonyer's affirmative ("yup") response to Herbert's statement regarding his desire or need to look at Gonyer's computer was a consent to the search of his computer.

### Conclusion

Based upon the foregoing, I recommend that the court deny the motion to suppress.

(Docket No. 16.)

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Dated January 25, 2006

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge